UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

SILVIA O'HARO and CLEVELAND : 
PINNOCK, individually and as : NO.: 1:09-CV-00340
guardians for D.P., :
      Plaintiffs : (JUDGE CONNER)
 : (MAGISTRATE JUDGE PRINCE)
v. :
 :
BOB EVANS FARMS, INC., :
      Defendant :
 :

## REPORT AND RECOMMENDATION

Pursuant to an Order entered on August 4, 2010 (Doc. 34), Honorable Christopher Conner referred defendant's pending motion for summary judgment (Doc. 22) to the undersigned Magistrate Judge.

**I. Background**

Plaintiffs Silvia O'Haro, Cleveland Pinnock, and D.P. have filed this action against defendant Bob Evans Farms, Inc. ("Bob Evans"), alleging several violations of their civil rights based on racial discrimination, and bringing claims under 42 U.S.C. §§ 1981 and 1982, as well as the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. Ann. § 951 *et seq*.

*(A) Facts of the case*

The facts of this case are in dispute. However, an overview is first stated here followed by each party's version. Bob Evans operates a chain of full-service, family-casual restaurants throughout much of the United States, including Restaurant No. 183, in

Hummelstown, Pennsylvania. (Doc. 24, ¶ 1.) On February 21, 2007, around 12:50 p.m., O'Haro and Pinnock, both of Jamaican birth, and their child D.P., visited Restaurant No. 183. (*Id.* ¶ 5; O'Haro Dep. 8:13–14, Dec. 2, 2009, Doc. 30-2; Pinnock Dep. 6:4–5, Dec. 2, 2009, Doc. 30-3.) When plaintiffs entered the restaurant, host Michael Brown greeted and seated them "right away," leading them to the back of the restaurant. (Doc. 24, ¶ 7; O'Haro Dep. 42:11–12, Dec. 2, 2009, Doc. 29-3 .) Brown chose the table at which to seat plaintiffs based on Bob Evans' Server Rotation Guidelines, which aims for an even distribution of customers among the sections of the restaurant for which each server is responsible. (Doc. 24, ¶ 10; Hollowell Dep. 21:13–14, Feb. 25, 2010, Doc. 29-6; Knisely Dep. 45:16–21, Feb. 26, 2010, Doc. 29-9.) Brown asked plaintiffs the size of their party, gave them menus, and got a high chair for D.P. upon O'Haro's request. (Doc. 24, ¶ 8; Hollowell Dep. 21:13–14.) Plaintiffs had voiced no preference for their seating location, but O'Haro noticed that all the other customers in the restaurant were in the front section, and that she, Pinnock, and D.P. were the only customers seated in the back. (*Id.* ¶ 9; O'Haro Dep. 42:13–18, 53:9–10.) Neither O'Haro nor Pinnock saw any other African Americans in the restaurant while they were there. (O'Haro Dep. 74:3–5; Pinnock Dep. 40:1–7, Dec. 2, 2009, Doc. 29-5.)

The parties dispute where exactly it was that plaintiffs were seated in the restaurant. Defendant asserts that plaintiffs were seated at table 70 following Bob Evans' Server Rotation Guidelines (Butler Aff. ¶ 13, Doc. 24-3, at 4; Defs.' Exs. 1–4, Doc. 24-3, at 8–12), and that plaintiffs reseated themselves at table 73 shortly thereafter (Butler Aff. ¶ 13, Doc. 24-3, at 4; Defs.' Exs. 1, 3, 4, Doc. 24-3, at 8–9, 11–12; Hollowell Dep. 38:11–17). Further, contends defendant, plaintiffs could not have been seated at Table 73, which is a booth, because it "would not have safely accommodated [D.P.'s] high chair," whereas Table 70 did accommodate high-chair use. (*See* Butler Aff. ¶ 18, Doc. 24-3, at 5.) Plaintiffs state that they did not change tables, although neither their evidence nor their

2

statement of facts establishes at which table they were seated. (O'Haro Dep. 55:22–56:6, 59:20–25; Pinnock Dep. 38:5–9.)

According to defendant, whether plaintiffs moved themselves from table 70 to 73 is significant because plaintiffs' server, Nichole Hollowell, neither saw plaintiffs move tables nor could see them at Table 73. (Doc. 24, ¶¶ 16–17; Butler Dep. 50:11–14, Feb. 26, 2010, Doc. 29-10.) Hollowell testified that she saw plaintiffs enter and sit in her section, but maybe "45 seconds later," when she looked back to see how many guests she would be serving and how much silverware she should take to the table, they "weren't there anymore." (Hollowell Dep. 37:18–22, 44:4–8.) Plaintiffs maintain that they remained visible, even if they were at table 73. (O'Haro Dep. 44:19–23 (Host Brown could see plaintiffs at their table); Pinnock 21:24–22:5 (referring to "[p]eople looking over there looking at us, didn't want to serve us" and "[a]ll of them girls serving coffee see us over there, didn't do nothing")).

It is undisputed that regardless of seating arrangements, plaintiffs received no service during the twenty to twenty-five minutes following their being seated; no one came to take their orders for drinks or meals. (Doc. 24, ¶ 20.) What happened next is contested.

(1) Plaintiffs' version of events

After about twenty minutes of sitting at the table without getting any service, O'Haro picked up a phone and dialed 911. (O'Haro Dep. 51:9–23.) She told them that she was in the restaurant, it seemed that she was being refused service, and her baby was crying. (*Id.* 51:24–52:2.) The police told her there was nothing they could do. (*Id.* 52:3–5.) Pinnock noticed that Host Brown "was looking down [their] section, so apparently he noticed that [they] didn't have anything to drink or eat." (*Id.* 44:21–23.) At some point—the timing is unclear from the testimony—Pinnock called his friend Leroy while he was still sitting at the table. (*Id.* 38:18–39:9.) Once a total of twenty to thirty

3

minutes had passed since they were seated, Pinnock got up and looked around. (Pinnock Dep. 22:11–15; O'Haro Dep. 44:2–6.) He proceeded to the bathroom, noticing on the way two white customers that were just being seated. (Pinnock Dep. 22:11–17.) When he got up, he observed that these white customers had yet to be served, but when he came back from the bathroom some two minutes later, they both had drinks. (*Id.* 22:17–19.) He returned to find O'Haro talking with someone he later learned was an assistant manager. (*Id.* 22:23–23:3.)

Meanwhile, before Pinnock returned, server Hollowell came to the table and said "what do you want to order," with a "tone of voice" that led O'Haro to ask if she could speak to a manager. (O'Haro Dep. 45:10–22.) Hollowell did not apologize for the wait that plaintiffs experienced, nor did she ask them if they would like any beverages. (*Id.* 60:2–11, 15–17.) After O'Haro stated that she wanted to speak to a manager, Hollowell left, and assistant manager Lorraine Knisely came to the table. (*Id.* 45:24–46:3.) O'Haro explained the situation to Knisely and let her know that they had received no service since arriving half an hour before. (*Id.* 46:4–8.) Knisely said that was "wrong," but did not offer to take their order then and did not offer to cover the check. (*Id.* 46:9–12, 63:1–6.) It was at this point in the discussion that Pinnock came back to the table. (*Id.* 46:12–13.) O'Haro testified during her deposition that Knisely did not apologize, but in August 2007 had verified a statement that she did. (*Id.* 46:9–12, 68:23–69:21; Letter from Jinada Rochelle, Human Relations Rep., Pa. Human Relations Comm'n, to Silvia O'Haro, Aug. 9, 2007, Doc. 24-4, at 26–28.) Pinnock testified that he asked Knisely why so much time had passed without getting any service, and Knisely apologized. (Pinnock Dep. 22:23–23:1; 26:6–12.)

Not long after Pinnock came back, O'Haro asked Knisely for a complaint form. (O'Haro Dep. 46:12–16.) Knisely responded that they have no complaint form. (*Id.* 46:17–18.) O'Haro asked to speak to the general manager. (*Id.* 46:19–21.) Knisely left

4

and retrieved Matthew Butler, the general manager, who came to the table, and O'Haro "explain[ed] what had happened."[1] (*Id.* 47:4–14.) Like Knisely, Butler said that Bob Evans had no complaint form, so he gave O'Haro a blank piece of paper. (*Id.* 47:15–19.) O'Haro used the paper to write out two identical statements, giving one to Knisely and keeping one for herself. (*Id.* 50:4–12; Pinnock Dep. 28:25–29:14.)

According to O'Haro's testimony, when plaintiffs were getting ready to leave, Knisely offered them some Bob Evans coupons; Pinnock testified that Knisely offered the coupons when they were walking out the door. (O'Haro Dep. 47:21–48:1; Pinnock Dep. 23:9–11.) O'Haro refused them without observing their value, taking them as an indication that she and the rest of her party were unwelcome there, being asked to go to a different restaurant. (O'Haro Dep. 48:6–12; 73:9–23.) She could recall no other response that she or Pinnock made to Knisely about the coupons, nor any conversation that either of them had with Hollowell on their way out of the restaurant. (*Id.* 48:13–17, 54:19–22; Pinnock Dep. 26:16–27–7.) When O'Haro's party was walking to the door, Knisely asked if she could at least feed the baby. (O'Haro Dep. 61:3–6; Pinnock Dep. 27:10–15.) O'Haro testified that Knisely made no further offers to her. (O'Haro Dep. 61:7–9, 63:10–17.)

During their visit to Bob Evans, neither O'Haro nor Pinnock ever asked anyone for a drink, for a meal, or for any food. (*Id.* 65:1–6; Pinnock Dep. 23:18–25:6.)

---

[1] O'Haro testified during her deposition that Butler "did not say much about it," but in the same August 2007 statement, verified that he had apologized. (O'Haro Dep. 47:13–14, 68:23–69:21; Letter from Jinada Rochelle, Doc. 24-4, at 26–28.) Pinnock testified that he was not sure or could not hear whether Butler apologized. (Pinnock Dep. 26:13–15.)

(2) Defendant's version of events

After not seeing plaintiffs where she expected them to be following their being seated in her section of the restaurant, Hollowell thought nothing further of it. (Hollowell Dep. 44:14–21.) She assumed that they had either left the restaurant or moved to the other side, out of her section, and she turned her attention elsewhere. (*Id.* 44:20–25.)

Twenty-five or thirty minutes after plaintiffs arrived, Hollowell was at the counter when Pinnock approached her and said that they had "been sitting back there and no one had waited on them." (*Id.* 47:11–15, 48:2–10.) Once he walked away, Hollowell went "right back" to table 73, apologized to O'Haro, explained that she did not see that they changed tables, and asked if she could get her a drink or if she would rather wait for Pinnock to return. (*Id.* 47:22–48:1.) She denied saying "what do you want." (*Id.* 48:23–24.) O'Haro explained that she was upset and had been sitting there for half an hour unacknowledged; Hollowell apologized again, and O'Haro said she wanted to speak to the manager. (*Id.* 49:3–7.) According to Hollowell's testimony, Pinnock was not at the table at any time that she was, but while she was talking to O'Haro, she saw Pinnock standing at the podium near the front of the restaurant talking on his phone. (*Id.* 51:1–3, 54:12–15.) Hollowell went to get Assistant Manager Lorraine Knisely and walked back to the table with her. (*Id.* 50:6–7, 13.)

Knisely was in the process of doing inventory in the stockroom when Hollowell came up to her and said that there was a problem with a customer, asking her to come up front. (Knisely Dep. 68:17–23, Feb. 26, 2010, Doc. 29-9.) When Knisely came to the table, she saw O'Haro sitting down and Pinnock "pacing back and forth" in the lobby of the restaurant. (*Id.* 73:21–74:15, 78:9–10.) When she got to the table, she apologized to O'Haro, offered to take plaintiffs' order, and said that it would be free of charge. (*Id.* 78:17–19, 85:22–24.) Plaintiffs did not want to eat; they said they were leaving. (*Id.* 79:1–2.) She summoned Matthew Butler, the general manager, once she realized that she

6

could do nothing for plaintiffs. (*Id.* 88:23–89:5.) By the time she returned with Butler, plaintiffs had left the table and in were in the lobby of the restaurant. (*Id.* 89:12–23.) Knisely followed them up front. (*Id.* 79:2.) She "begged them to please let [her] give them a carry-out meal to go." (*Id.* 79:7–10.) "[P]lease let me feed the child, no charge," she said. (*Id.*) Still up front, she offered them coupons. (*Id.* 79:11, 17.)

Butler, too, apologized "profusely" and "begged them to stay." (Butler Dep. 41:11–12, Feb. 26, 2010, Doc. 29-10; Knisely Dep. 92:1–3.) He reiterated Knisely's offer to comp plaintiffs' meal and give them Bob Evans coupons good at any Bob Evans restaurant, but they refused. (Butler Dep. 41:12–16.) Plaintiffs asked Butler for a complaint form; he responded that he had no complaint forms, but that comment cards were on every table, and offered those. (*Id.* 67:6–8; 28:22–23.) But comment cards were "not what they wanted," so Butler said he could give plaintiffs a blank piece of paper if they wanted to write something down. (*Id.* 67:9–12.) At this time, Butler stated, O'Haro was sitting on a bench in the restaurant lobby, although he was not certain of his recollection. (*Id.* 67:25–68:5.) He gave O'Haro a blank piece of paper, and she wrote something down. (*Id.* 67:13–16.) He first testified that he did not believe that plaintiffs gave him the paper they had written on, and later testified that he could not recall whether they gave him the paper. (*Id.* 67:17–21; 69:5–10.) Then plaintiffs left. (*Id.* 41:15–16; Knisely Dep. 93:8–11.)

**II. Standard of Review**

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some*

7

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

## III. Discussion

### *(A) Legal standard*

The two federal laws involved in this case, 42 U.S.C. §§ 1981 and 1982, both contain guarantees of civil rights. Section 1981 states that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1982, in turn, guarantees to "[a]ll citizens . . . the same right . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." *Id.* § 1982.

For the purposes of summary judgment, the standard of review for the PHRA claim is the same as that for the § 1981 claim, rendering the federal-law analysis equally applicable to its state counterpart. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). The federal laws, in turn, have similar but not identical prima facie cases. A § 1981 claim requires a plaintiff to "allege facts in support of the following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute." *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (quoting *Yelverton v. Lehman*, No. 94-6114, 1996 WL 296551, at *7 (E.D. Pa. June 3, 1996) (alteration in original)). By comparison, a plaintiff seeking to establish a § 1982 claim "must allege with specificity facts sufficient to show or raise a plausible inference of (1) the defendant's racial animus; (2) intentional discrimination; and (3) that the defendant deprived plaintiff of his rights because of race." *Id.* (quoting *Garg v. Albany Indus. Dev. Agency*, 899 F. Supp. 961, 968 (N.D.N.Y. 1995)).

Section 1981 claims are analyzed under the three-step *McDonnell Douglass* burden-shifting framework. *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999) (citing *McDonnell Douglass v. Green*, 411 U.S. 792 (1973)). Because the same facts apply to plaintiffs' § 1982 claim, the *McDonnell Douglass* standard applies to that claim as well. *See Portis v. River House Assocs., L.P.*, No. 08-2123, 2008 WL 4452378, *7 (M.D. Pa. Sept. 30, 2008) (applying *McDonnell Douglass* to claims under the Fair Housing Act, § 1981, and § 1982 because the same evidence provided the basis for all three); *Shipley v. B&F Towing Co.*, No. 04-1530, 2006 WL 1652787, at *2 (D. Del. June 13, 2006). Under this standard, plaintiffs have the burden of establishing a prima facie case of discrimination under both § 1981 and § 1982. If plaintiffs establish their prima facie case, the burden shifts to defendants to provide legitimate nondiscriminatory reasons for their actions. *Pamintuan*, 192 F.3d at 385. Defendant's successful proffer of such nondiscriminatory reasons would then shift the burden back to plaintiffs to provide evidence that these reasons were pretextual. *Id.*

*(B) Intentional discrimination*

Although there is no dispute about plaintiffs' race, plaintiffs yet failed to mention in their statement of facts or explicitly establish through depositions that plaintiffs are, in fact, members of a racial minority. The closest that plaintiffs get to the matter is in O'Haro's testimony:

> Q: Were there any other persons of your race or color located in the restaurant at the time that you were there?
>
> A: No, I couldn't recall seeing any.

(O'Haro Dep. 74:3–5.)

And in Pinnock's testimony:

> Q: Just, Mr. Pinnock, when you were at the restaurant, were there any other persons of your ethnicity or color in the restaurant as customers?
>
> A: Only whites I see there.
>
> Q: Only white. Is that a no to my question, no other persons African American [sic] that you saw?
>
> A: No.
>
> Q: No other persons of darker skin color?
>
> A: No.

(Pinnock Dep. 39:25–40:7.) Although this case need not founder on plaintiffs' failure positively to establish a fact the truth of which they took for granted, there being some evidence of plaintiffs' race in the record, plaintiffs would be encouraged to avoid assuming facts not in evidence in the future.

The analysis proceeds to the question of intentional discrimination, proof of which is required for claims under both § 1981 and § 1982.

Plaintiffs claim that the following facts establish circumstantial evidence of discriminatory intent:

- Defendant "segregat[ed]" plaintiffs from the other customers, all of whom were Caucasian.

- Defendant seated plaintiffs in the back half of the restaurant "behind a wall[,] separating them from where all other customers were seated and being served," and seated Caucasian customers who arrived later in the front of the restaurant.

- Defendant failed to serve plaintiffs, despite Caucasian customers who entered after plaintiffs receiving service.

11

(Doc. 30, at 10.) The sole case that plaintiffs cite in support of their argument is *Harrington v. Harris*, 108 F.3d 598, 606 (5th Cir. 1997), *opinion withdrawn and superceded*, 118 F.3d 359 (1997), which is irrelevant except insofar as it stands for the uncontroversial proposition that circumstantial evidence may be used to establish discriminatory intent. *See also Commonwealth v. Flaherty*, 983 F.2d 1267, 1273 (3d Cir. 1993)) ("[A] *prima facie* showing of discriminatory intent may be proven indirectly, without a 'smoking gun,' on the 'totality of the relevant facts,' including disparate impact *if* coupled with some other indicia of purposeful discrimination."(quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976))).

Despite plaintiffs' failure to cite any cases on this point that are still good law, a review of the record in a light most favorable to plaintiffs reveals that they have produced sufficient evidence to support an inference of discriminatory intent. They were the only members of a minority racial group in defendant's restaurant, they were seated in an otherwise unoccupied area of the restaurant, and they observed other white customers—who arrived after they did—being served before they could even place an order. Plaintiff Pinnock testified to making eye contact with host Brown while waiting for service, and yet still received no attention from any server until (at least according to server Hollowell's testimony) Pinnock left the table and specifically asked why, after half an hour, their orders had yet to be taken. *Cf. Bobbitt v. Rage, Inc.*, 19 F. Supp. 2d 512, 517–18 (W.D.N.C. 1998) (finding "racially discriminatory animus" upon allegations of refusal of service and denial of food).

*(C) Deprivation of right to statutorily enumerated activities*

In addition to showing membership in a racial minority and discriminatory intent, a § 1981 plaintiff must establish "discrimination concerning one or more of the activities enumerated in the statute." *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)

12

(quoting *Yelverton v. Lehman*, No. 94-6114, 1996 WL 296551, at *7 (E.D. Pa. June 3, 1996)). This third element of the § 1981 prima facie case thus requires evidence of deprivation of a right "relat[ing] to the making and enforcement of contracts [or] property transactions." *Desi'z Pizza, Inc. v. City of Wilkes-Barre*, No. 01-0480, 2006 WL 2460881, at *12 (M.D. Pa. Aug. 23, 2006). The context-specific protection of § 1981 "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Id.* (citing *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)).

In the relevant respects, the facts in this case are analogous to those in *Bobbit*, which involved a group of thirteen plaintiffs, all members of a minority group who visited a Pizza Hut restaurant. The group entered the restaurant and waited ten to twelve minutes to be seated, at which point a waitress approached the group, determined their number, and pushed tables together for them. *Bobbitt*, 19 F. Supp. 2d at 514. The waitress returned to the kitchen without a further word. *Id.* After "standing and waiting a few more minutes," the plaintiffs seated themselves. *Id.* Ten to fifteen minutes later, the plaintiffs retrieved menus for themselves because no one had given them any. *Id.* The plaintiffs noticed that some white customers had entered the Pizza Hut after them and had had their orders taken. *Id.* at 514–15.

The waiter who ultimately came to take their order apologized to the group for the long wait and, "referring to the other staff at the restaurant, stated that it was 'their belief to act this way.'" *Id.* at 515. At the time that the plaintiffs' order was taken, the white customers had already been served their food. *Id.* When their order "finally" came, they noticed that the pizza had "insufficient sauce" on it. *Id.* They complained to a waitress, who "initially ignored them," but then brought out the assistant manager. *Id.* "In his effort

to demonstrate the sufficiency of the sauce, the assistant manager used his fingers to pull back a layer of cheese." *Id.*

As was the case in *Bobbitt*, plaintiffs have shown neither that their creation of a contractual relationship was blocked nor that an existing contractual relationship was impaired. All that plaintiffs have established is poor service. Despite their argument that "[d]efendant's acts blocked the creation of a contract" (Doc. 30, at 10), plaintiffs admit that they were freely able to enter the restaurant, they were promptly seated, and a server did eventually approach them and offer to take their order. They admit that they never asked anyone for a drink, for a meal, or for any food. Plaintiffs' refusal to stay and eat at defendant's restaurant is not equivalent to the actual denial or impairment of a contractual relationship, and "the mere fact of slow service" does not "rise to the level of violating one's civil rights." *Robertson v. Burger King, Inc.*, 848 F. Supp. 78, 81 (E.D. La. 1994). Plaintiffs may have been treated unpleasantly, but they have not "allege[d] the actual loss of a contract interest." *Bobbitt*, 19 F. Supp. 2d at 518 (citing *Morris v. Office Max, Inc.*, 89 F.3d 411, 414 (7th Cir. 1996)).

Plaintiffs cited *Gilyard v. Northlake Foods, Inc.*, 367 F. Supp. 2d 1008, 1014 (E.D. Va. 2005), for the proposition that restaurant services include willingness to take an order, and contend in so doing that plaintiffs were denied this service. Although *Gilyard* does stand in part for this proposition, plaintiffs precluded the viability of their claim by admitting that server Hollowell came to the table and said "what do you want to order." (O'Haro Dep. 45:10–22.) O'Haro may not have liked Hollowell's "tone of voice" (*id.*), but the opportunity for plaintiffs to place an order with defendant was never actually denied.

*Gilyard* is further instructive as an example of what constitutes a successful prima facie case under § 1981. In that case, the plaintiffs entered a Waffle House without being greeted and without being seated, and were affirmatively told by a waitress that their party of five could not sit at an empty five-person table. *Gilyard*, 367 F. Supp. 2d at 1011.

14

They seated themselves anyway. *Id.* The waitress brought side dishes of waffles to the table, and then an order of grits for one of the plaintiffs:

> When the food was placed in front of [the plaintiff], it was immediately apparent that there were flies or pieces of flies cooked into the grits. The flies were large, black, mixed into the white grits, and obviously visible. Anybody merely glancing at the dish would have immediately noticed the flies. All the Plaintiffs saw them and were horrified.

*Id.* The court found that the plaintiffs had successfully stated a prima facie case based on the denial of the right to contract for edible food. *Id.* at 1014–15.

Nothing like the situation in *Gilyard* occurred in the present case. Defendant's server came to take plaintiffs' order, and instead of placing an order, plaintiffs asked to speak to a manager. When defendant's managers offered plaintiffs complementary coupons, they refused; O'Haro testified that, to her, the coupons meant "that they did not want [her] there at that restaurant, so [she] could take the coupon[s] and go somewhere else." (O'Haro Dep. 73:14–17.) But O'Haro's subjective impression of the coupons' import is not enough to establish an actual denial of service. In fact, O'Haro testified that as of the time the coupons were offered, she and Pinnock were already getting ready to leave. (*Id.* 47:21–24.) Since plaintiffs had made it clear that they had no intention of staying, the only reasonable interpretation of defendant's offer of coupons was to make an attempt at rectifying the situation. (*See id.* 48:2–5 ("Q: . . . So she was saying if you don't want to eat here, here is some coupons, you can eat at a different Bob Evans Restaurant? A: Right.").)

The above analysis applies equally to plaintiff's claims under both § 1981 and § 1982. Just as plaintiffs needed to show that the alleged discrimination under § 1981 related to the making or enforcement of a contract, their § 1982 claim required a showing that the alleged discrimination related to a real or personal-property transaction. *Desi'z Pizza, Inc. v. City of Wilkes-Barre*, No. 01-0480, 2006 WL 2560881, at *12 (M.D. Pa. Aug. 23, 2006). There was never any denial of plaintiffs' right to purchase personal

15

property, viz., a meal at defendant's restaurant; rather, plaintiffs chose not to avail themselves of the opportunity to purchase a meal when the opportunity presented itself.

Plaintiffs have failed to show that they suffered "discrimination concerning one or more of the activities enumerated" in § 1981. *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (quoting *Yelverton v. Lehman*, No. 94-6114- 1996 WL 296551, at *7 (E.D. Pa. June 3, 1996)). Their § 1981 claim fails as a result of their inability to make this showing. Plaintiffs have similarly failed to establish "with specificity" facts that evince denial of a right to purchase personal property, precluding any chance that their § 1982 claim will succeed. *Id.*; *Desi'z Pizza*, 2006 WL 2560881, at *12. Because plaintiffs' PHRA claim is subject to the same analysis as their federal claims, the PHRA claim fails as well.

## IV. Conclusion

Based on the foregoing discussion, it is recommended that defendant's motion for summary judgment be GRANTED, and plaintiff's complaint be dismissed in full.

s/ William T. Prince
William T. Prince
United States Magistrate Judge

October 4, 2010